UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

JOSHUA THIBODEAUX                               CIVIL ACTION

VERSUS

THE DOW CHEMICAL COMPANY, ET               NO: 16-00567-BAJ-RLB
AL.

RULING AND ORDER

Before the Court is the **Motion for Summary Judgement (Doc. 23)** filed by

Defendant, the Dow Chemical Company ("Dow"). Plaintiff filed an Opposition. (Doc.

32). Defendant then filed a Reply. (Doc. 37). The Court has jurisdiction under 28

U.S.C. § 1332. Oral argument is not necessary. For the following reasons, the **Motion**

**for Summary Judgment (Doc. 23)** is **GRANTED**.

I.    BACKGROUND

1. Race-Based    Hostile    Work    Environment    and    Racial
   Discrimination Claims

Plaintiff began his employment at Dow on August 4, 2014,[1] as a Process

Technician (Operator Trainee) in the Chlorine I unit ("unit"). (Doc. 23-2 at ¶ 8). Dow

is a manufacturer of various chemicals, plastics, and agricultural products, and

operates a plant in Plaquemine, Louisiana. (*Id.* at ¶ 1). Plaintiff's racial harassment

---

[1] Dow's statement of undisputed facts and memorandum provide an employment date of August 4,
2017 (Doc. 23-2 at ¶ 8; Doc. 23-1 at p. 2); however, this date is inconsistent with the material facts,
which include a termination date of July 27, 2015, and an offer of employment date in July 2014.
Therefore, for purposes of summary judgment, the Court will assume an employment date of August
4, 2014. (*See* Doc. 32 at p. 2; Doc. 23-6 at p. 114).

and race-based hostile work environment claims are based on various incidents involving different actors. (*Id.* at ¶ 103). Plaintiff reported to management multiple instances of harassment and regular bulling by his white counterparts beginning in approximately October 2014. (Doc. 32-2 at ¶ 24; Doc. 23-2 at ¶ 100). According to Plaintiff, at the beginning of his employment, Keith Long, Dow's Activity Coordinator, explained to Plaintiff that his "job was given to him while white guys had to work for their jobs." (Doc. 32-2 at ¶ 5). During this interaction, Long leaned into Plaintiff's personal space to intimidate him; Plaintiff was forced to "back up." (*Id.* at ¶ 6). Plaintiff reported this incident to Karin Cook, the Operations Leader ("Cook"), who was allegedly "dismissive." (*Id.* at ¶ 7).

On October 3, 2014, Plaintiff left his unit without notifying the Board Operator to take a personal phone call; he was later found in a different unit talking on his cell phone. (Doc. 23-2 at ¶¶ 14–15). On October 6, 2014, Plaintiff was written-up for his violation of the accountability policy, which provided that "an employee is required to notify the immediate response leader ("IRL"), a Board Operator, in the event he needs to leave the Chlorine I unit." (*Id.* at ¶ 12). Thereafter, Plaintiff participated in a counseling session with Dean Cavalier, the Training Coordinator ("Cavalier"), to review the policy. (*Id.* at ¶ 18). The policy further included the requirement that an employee sign in and out via the magnetic board. (*Id.* at ¶ 19). The next day, although Plaintiff was "gone for the day," his magnetic employee pin was in the "in" position. (*Id.* at ¶ 20). According to Plaintiff, another employee moved his employee pin from the "out" to the "in" position. (Doc. 32-2 at ¶ 16).

Later in Plaintiff's employment, Cook spoke about a former employee that "wore a hoodie and sagged his pants" and told Plaintiff to remove his hoodie, while white operators were permitted to wear baseball hats. (Doc. 32-2 at ¶¶ 8–9). Additionally, Plaintiff was required to take his written tests[2] inside the training coordinator's office, while white operators were allowed to take tests in the library or in an area across from that office. (*Id.* at ¶ 10). Moreover, white males were allegedly given the exact questions to pass the exam for the operators training program. (*Id.* at ¶ 11). Furthermore, Plaintiff's bathroom breaks were regularly monitored while other employees could leave for regular breaks with no supervision or approval. (*Id.* at ¶ 12).

Plaintiff reported his complaints of discrimination to Keith Landry, his Shift Captain, who reported said concerns to Cook. (*Id.* at ¶¶ 20–22). In response, Cook spoke with other black operators to investigate Plaintiff's concerns of racial discrimination, and following the June 30, 2015 complaints, which are addressed *infra*, she and Steve Ledoux, the Production Leader of the unit ("Ledoux"), reported Plaintiff's allegations to Human Resources via email for further investigation. (Doc. 23-9 at p. 72).

### 2. Disability Discrimination Claims

On June 30, 2015, Plaintiff went on a paid leave of absence due to a medical condition, "Adjustment Disorder with Depressed Mood and Anxiety" ("Adjustment

---

[2] These tests occurred in January 2015 and March 2015. (Doc. 23-2 at ¶¶ 29–30, 40–41).

Disorder"), as diagnosed by Plaintiff's licensed social worker. (Doc. 23-2 at ¶ 48; Doc. 23-12 at p. 6).

Specifically, in her June 29, 2015 report, the social worker confirmed that Plaintiff had been diagnosed with Adjustment Disorder "due to job-related stress because of undue pressures and issues that occur on a daily basis that seemed to be unavoidable." (Doc. 23-6 at p. 136). The social worker noted that Plaintiff exhibited the following symptoms: (1) extreme anxiety as it relates to concentration; (2) extreme anxiety as it relates to job difficulties; (3) difficulty completing normal daily tasks; (4) feelings of hopelessness, worthlessness, discomfort, and loss of control; (5) extreme fatigue and excessive physical pain; (6) extreme tension and stress; (7) nervousness and apprehension; (8) fear and racing thoughts; and (9) extreme irritability and emotional distress. (*Id.*). Furthermore, the social worker referred Plaintiff for a psychiatric evaluation to determine need for medication; and she recommended a leave of absence from work for at least three weeks with continued individual weekly therapy sessions, as well as a possible transfer to a less stressful environment within Dow. (*Id.* at pp. 136–37).

On June 30, 2015, during a meeting with Cook, Plaintiff made allegations of racial harassment and discrimination at the facility; questioned numerous administrative actions taken by Cook, including disciplinary actions; and ultimately asked to be transferred to another unit. (Doc. 23-6 at pp. 138–39). Nonetheless, Plaintiff was informed that, unless medically necessary, he would be unable to transfer due to his performance issues. (Doc. 23-2 at ¶ 51). To further address

Plaintiff's concerns, Cook enlisted the assistance of Ledoux to meet with Plaintiff on the same day. (*Id.* at ¶ 54).

At this meeting, Plaintiff made allegations that control board operators had been sleeping on the job,[3] he restated his complaints and concerns regarding racial harassment and discrimination, and again requested a transfer. (Doc. 32-1 at ¶ 55). Following this meeting, Ledoux sent Plaintiff home and deactivated his gate badge;[4] and Ledoux did not speak to any operators about the complaints, and he did not recommend any investigation into the allegations. (Doc. 32-2 at ¶ 91–94).

Nonetheless, in light of the report from Plaintiff's social worker, Plaintiff was directed to Human Resources and Health Services ("Health Services"), Dow's medical department. (Doc. 23-2 at ¶ 56). Plaintiff met with Nathan Britt, the Nurse Practitioner, and conveyed that he was feeling depressed and anxious, that he was subjected to discrimination and a racist environment, and that he needed to be transferred to another unit. (*Id.* at ¶¶ 57–58; Doc. 23-6 at p. 141). After a review of the social worker's report, Plaintiff was placed on paid medical leave for at least three

---

[3] According to Plaintiff, he witnessed at least nine on-duty operators sleeping in the control room, and he showed Ledoux photographs of those sleeping operators to corroborate his reports. (Doc. 32-2 at ¶¶ 89–90). However, despite Plaintiff's reference to these photographs, at no time did he or Dow place them into the record. Nonetheless, there is a high priority placed on safety at Dow's facility because the risk associated with chlorine liquid and chlorine gas is considerable, given that a large discharge or release can pose a danger to the surrounding communities. (Doc. 32-2 at ¶¶ 70–79). Two board operators are required to be in the control room at all times, and their jobs are to observe every section of the board to ensure that there are no warnings or abnormalities and that operations are proceeding normally. (*Id.*).

[4] Deactivation of a badge prevents the employee from entering the Dow site, and occurs when an employee is either terminated or if Dow does not want the employee to access the site. (Doc. 32-2 at ¶ 92).

weeks, and/or until medically cleared, which leave would have allegedly ended on or after July 21, 2015.[5] (Doc. 23-2 at ¶¶ 60–61).

During his medical leave, Plaintiff was expected to follow-up with Dow's Health Services regarding his health status, and to comply with the recommendations of his health care providers. (*Id.* at ¶ 63). According to Dow, Plaintiff did not contact Britt for a follow-up appointment scheduled for July 14, 2015, he did not undergo a psychiatric evaluation to determine the need for medication as recommended, and according to the social worker, Plaintiff attended therapy sessions—all before and after (not during) the June 30 to July 21 medical leave period—not including unspecified phone calls.[6] (*Id.* at ¶¶ 64–70).

By July 21, 2015, Dow had not received medical documentation from Plaintiff's medical provider regarding Plaintiff's ability to return to work or need for additional medical leave. (*Id.* at ¶ 72). On July 22, 2015, during a follow-up appointment with Britt, Plaintiff was informed that Health Services would need medical documentation to validate his time off and that a Health Certification Form ("Form") would be emailed to him to be completed by his health care provider to further validate his need to be off at that time. (Doc. 23-6 at p. 143). On July 23, 2015, Britt emailed Plaintiff the Health Certification Form; Britt did not provide any other information.

---

[5] Plaintiff disputes that there was a certain date provided on his medical leave because his return to work was subject to his medical provider authorizing him to return to work, and that a return date was never communicated to him, either verbally or in writing. (Doc. 32-1 at ¶ 71; Doc. 32-2 at ¶¶ 45–48). However, the record reflects that all parties characterized the leave time to be at least three weeks pending medical documentation and/or the results of an investigation into Plaintiff's discrimination allegations and possible transfer. (Doc. 32-6 at p. 35; Doc. 23-6 at pp. 40–42, 136; Doc. 23-8 at p. 4).

[6] In his responses to Dow's interrogatories, Plaintiff stated that he had "[o]ffice visits [with the social worker] on or about June 26, 2015, June 29, 2015, July 30, 2015 and August 10, 2015. Other communications occurred August 13, 2015 – September 17, 2015." (Doc. 23-6 at p. 157).

(*Id.* at p. 144). On July 27, 2015, via email, Plaintiff acknowledged receipt of same and provided that he emailed the Form to his social worker and was waiting for her response. (*Id.*).

Nonetheless, on that date, July 27, 2015, Dow proceeded with a Medical Review Board ("MRB") procedure to discuss Plaintiff's employment.[7] (Doc. 23-2 at ¶¶ 77–78). At that time, Dow still did not possess the required documents to validate Plaintiff's extension of paid medical leave beyond July 21, 2015. (*Id.* at ¶ 80). On July 27, Dow's MRB decided to terminate Plaintiff's employment due to his failure to comply with the requirements of Health Services; a letter was mailed to Plaintiff the same day. (*Id.* at ¶ 81; Doc. 23-6 at p. 147). Britt did not notify Human Resources of Plaintiff's July 27 email, which Dow contends would not have changed the termination decision. (Doc. 23-2 at ¶ 85).

On May 4, 2016, Plaintiff submitted an Intake Questionnaire with the Equal Employment Opportunity Commission ("EEOC"), and on June 9, 2016, Plaintiff submitted a Charge of Discrimination with the EEOC alleging that he was subjected to discrimination due to his race (African American) and disability (Adjustment Disorder). (Doc. 23-6 at pp. 148–52).

Plaintiff filed his lawsuit on July 22, 2016 in state court, which was removed to federal court on August 26, 2016. (Doc. 1). In his amended complaint, Plaintiff asserts claims for racial discrimination, hostile work environment, and disability discrimination under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e ("Title VII");

---

[7] This meeting was held at 9:30 AM. Plaintiff's email was sent at 9:57 AM. (Doc. 23-8 at pp. 25–26).

the Americans with Disabilities Act, 42 U.S.C. § 12101 ("ADA"); the Louisiana Employment Discrimination Law, La. Rev. Stat. 23:301 ("LEDL"); as well as whistleblower retaliation pursuant to the Louisiana Environmental Whistleblower Statute, La. Rev. Stat. 30:2027 ("LEWA"). (Doc. 10). Plaintiff asserts an additional claim for tort damages pursuant to Louisiana Civil Code Article 2315. (*Id.*).

## II.   LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether the movant is entitled to summary judgment, the court views the facts in the light most favorable to the nonmovant and draws all reasonable inferences in the nonmovant's favor. *Coleman v. Hous. Indep. Sch. Dist.*, 113 F.3d 528, 533 (5th Cir. 1997).

After a proper motion for summary judgment is made, the nonmovant "must set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal citations omitted). At that moment, the court does not evaluate the credibility of witnesses, weigh the evidence, or resolve factual disputes. *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991), *cert. denied*, 502 U.S. 1059 (1992). However, if "the evidence in the record is such that a reasonable jury, drawing all inferences in favor of the non-moving party, could arrive at a verdict in that party's favor," the motion for summary judgment must be denied. *Id.* at 1263.

Adversely, the nonmovant's burden is not satisfied by some metaphysical doubt as to the material facts, or by conclusory allegations, unsubstantiated

assertions, or a mere scintilla of evidence. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (internal quotations omitted). Summary judgment is appropriate if the nonmovant "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## III. DISCUSSION

### A. Exhaustion of Administrative Remedies

In support of its motion, Dow argues that Plaintiff's Title VII claims of race discrimination and race-based hostile work environment are time-barred because they are based on events that occurred 300–days prior to May 5, 2016,[8] and therefore, must be dismissed as a matter of law. (Doc. 23-1 at pp. 9, 15). In opposition, Plaintiff disputes that his claims are time-barred, and asserts Louisiana's continuing violations doctrine. (Doc. 32 at p. 15).

### 1. Timeliness of Title VII Claims

Under Title VII, a plaintiff must exhaust administrative remedies before pursuing employment discrimination claims in federal court. *Garcia v. Penske Logistics, L.L.C.*, 631 F. App'x 204, 207 (5th Cir. 2015) (citing *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378–79 (5th Cir. 2002)). For Title VII claims, "[e]xhaustion occurs when the plaintiff files a timely charge with the EEOC and receives a statutory notice of right to sue." *Id.* (citing *Dao v. Auchan Hypermarket*, 96 F.3d 787, 788–89

---

[8] According to Dow, Plaintiff filed his Charge of Discrimination with the EEOC on May 5, 2016. (Doc. 23-1 at p. 9). However, the record reflects that the EEOC Charge of Discrimination was submitted on or after June 9, 2016, and the Intake Questionnaire was submitted on or after May 4, 2016. (Doc. 23-6 at pp. 148–52).

(5th Cir. 1996)). For a Charge to be timely, "[a]n individual claiming discrimination in violation of Title VII must file [the Charge] within 300 days 'after the alleged unlawful employment practice occurred.'" *E.E.O.C. v. WC&M Enterprises, Inc.*, 496 F.3d 393, 398 (5th Cir. 2007) (quoting 42 U.S.C. 2000e—5(e)(1)).

However, because a hostile work environment generally consists of multiple acts over a period of time, the requisite EEOC Charge must be filed within 300 days of any action that contributed to the hostile work environment. *WC&M Enterprises, Inc.*, 496 F.3d at 398 (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115, 117 (2002)); *see also Pegram v. Honeywell, Inc.*, 361 F.3d 272, 279–80 (5th Cir. 2004). If that requirement is met, the Court may consider all of the acts that are alleged to have contributed to the hostile work environment, even though some of them may have taken place outside of the 300 day filing period. *Id.*

Here, the exact date on which the EEOC received the "Charge" is absent from the record. Thus, for purposes of this motion the Court will consider the date Plaintiff submitted the EEOC Intake Questionnaire because the earliest date that Plaintiff's "Charge" can be deemed "filed" within the bounds of Title VII is the date the EEOC received the Questionnaire, that is on or after, May 4, 2016.[9] The Court notes that if

---

[9] The United States Court of Appeals for the Fifth Circuit has recognized that an intake questionnaire that informs the EEOC of the identity of the parties and describes the alleged discriminatory conduct in enough detail to enable the EEOC to issue an official notice of charge to the respondent is sufficient to "set[ ] the administrative machinery in motion." *Conner v. Louisiana Dep't of Health & Hosps.*, 247 F. App'x 480, 481 (5th Cir. 2007) (per curiam) (quoting *Price v. Southwestern Bell Tel. Co.*, 687 F.2d 74, 78 (5th Cir. 1982)); *see also Edelman v. Lynchburg College*, 535 U.S. 106, 118-19 (2002) (upholding EEOC regulation 29 C.F.R. § 1601.12(b), which permits an untimely verified EEOC charge to relate back to the filing date of timely unverified EEOC charge). *Kirkland v. Big Lots Store, Inc.*, 547 F. App'x 570, 572 (5th Cir. 2013) (an intake questionnaire may constitute a filing for the purposes of Title VII).

it considers the date the Charge itself was submitted, that is, on or after, June 9, 2016, all of Plaintiff's claims under federal law would be rendered untimely.

Construing the facts in the light most favorable to Plaintiff and drawing all reasonable inferences in his favor, the Court will consider the complaints made to Cook and Ledoux on June 30, 2015, as the most recent act that is alleged to have contributed to the hostile work environment and race discrimination claims because it is on this date that Plaintiff took his paid medical leave of absence and never returned to work due to his termination on July 27, 2015. As the last act that may be attributed to the race-based hostile work environment and race discrimination claims, this date must have occurred inside of the 300 day period. If it does, the Court may consider the acts that may have occurred outside of the 300 day filing period.

The Court finds that the June 30, 2015 date does not fall within the 300 day filing period. For this requirement to be met, the EEOC must have received his complaint by April 25, 2016; however, it was submitted on or after May 4, 2016. (Doc. 23-6 at p. 152). Therefore, because the EEOC Charge must have been filed within 300 days of any action that contributed to the hostile work environment, Plaintiff's race-based hostile work environment and race discrimination claims are untimely. *See e.g., WC&M Enterprises, Inc.*, 496 F.3d at 398.

The Court notes that Plaintiff's termination does not qualify as an act within the time period because, although Plaintiff's termination date, July 27, 2015, falls within the 300 day time period given that the Questionnaire was submitted on day 282, Plaintiff does not allege that he was terminated because of his race or that his hostile work environment claims were related to, or contributed to, his termination.

In other words, there has been no evidence that Plaintiff's termination contributed to the hostile work environment.[10] Additionally, the Court finds that Plaintiff's claims do not fall within the continuing violation exception because this exception requires the same type of discriminatory acts to occur both inside and outside the limitations period. *Estate of Martineau v. ARCO Chem. Co.*, 203 F.3d 904, 913 (5th Cir. 2000) (citing *Berry v. Bd. of Sup'rs of L.S.U.*, 715 F.2d 971, 979–81 (5th Cir. 1983)). Therefore, Plaintiff's Title VII claims of race-based hostile work environment and racial discrimination are dismissed.

## 2. Exhaustion of Retaliation Claims

Dow contends that Plaintiff's retaliation claims under Title VII and the ADA are time-barred because Plaintiff did not expressly check the retaliation box in his EEOC Charge and failed to reference a retaliation claim in his Charge and Initial Questionnaire. (Doc. 23-1 at p. 12). Dow further argues that the cover letter submitted by Plaintiff's attorney accompanying the Questionnaire states that Plaintiff's Charge is limited to discrimination "based upon race and a medically diagnosed disability." (Doc. 23-5 at p. 3). In response, Plaintiff asserts that Dow has

---

[10] Rather, Plaintiff asserts that a "holistic" approach was taken at the meeting in deciding to terminate Plaintiff, but that Dow "asserted attorney-client privilege in depositions . . ., which preclude[ed] [Plaintiff] from discovering whether any discussions at that meeting related in any way to the discriminatory and hostile work environment that [Plaintiff] experienced and complained of to his superiors." (Doc. 32 at p. 20). Additionally, Plaintiff asserts that "[Dow's] stonewalling [] has prevented [him] from seeking discovery of relevant and important evidence surrounding the substance of his termination meeting." (*Id.*). At the summary judgment stage, however, any issues during the discovery stage are not properly before the Court. Plaintiff never moved for a continuance, filed a motion to compel, or submitted an affidavit showing how the outstanding discovery could assist him in opposing the motion for summary judgment. *See Netto v. Amtrak*, 863 F.2d 1210, 1215 (5th Cir. 1989); *see also* Fed.R.Civ.P. 56(d).

proffered no legal authority or other support for its contention that failing to "check the box for retaliation" on the EEOC Charge barred the claim. (Doc. 32 at p. 19).

"[T]he scope of an EEOC charge should be liberally construed for litigation purposes because Title VII 'was designed to protect the many who are unlettered and unschooled in the nuances of literary draftsmanship.'" *Parker v. State of La Dep't of Educ. Special Sch. Dist.*, 323 F. App'x 321, 329 (5th Cir. 2009) (quoting *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 465 (5th Cir. 1970)). A Title VII complaint may include the allegations contained in the EEOC charge and those that "can reasonably be expected to grow out of the charge of discrimination." *Id.* (quoting *Sanchez*, 431 F.2d at 466). Consequently, the United States Court of Appeals for the Fifth Circuit has "decline[d] to hold that the failure to place a check mark in the correct box [on the Charge of Discrimination form is] a fatal error." *Sanchez*, 431 F.2d at 463. Along those lines, the Fifth Circuit does not require a "plaintiff [to] check a certain box or recite a specific incantation to exhaust," *Pacheco v. Mineta*, 448 F.3d 783, 792 (5th Cir. 2006) (footnote omitted), and will not "cut off [a party's rights] merely because he fails to articulate correctly the legal conclusion emanating from his factual allegations," *Sanchez*, 431 F.2d at 462. Furthermore, "failure to fill in the appropriate box in the filed charge" warrants summary judgment on exhaustion grounds only when "coupled with the inability to describe the general nature of the claim in the narrative section of the charge." *Miller v. Sw. Bell. Tel. Co.*, 51 F.App'x. 928, at *7 (5th Cir. 2002).

Here, Plaintiff checked "Race" and "Disability" in the Charge of Discrimination and in the Intake Questionnaire. (Doc. 23-6 at pp. 148–52). Within the "Particulars"

section, Plaintiff further alleged these claims but also included a claim for hostile work environment. *Id.* It is clear that administrative remedies have been exhausted for the "race" and "disability" claims because they have been checked and discussed in the "Particulars" section of the Charge. Additionally, in the "Particulars" section, Plaintiff provided that he "was denied a reasonable accommodation which required a job transfer to another unit." (Doc. 23-6 at p. 148). Dow observes, however, that Plaintiff neither checked the box for retaliation, nor claimed retaliation in the narrative section of his Charge or Questionnaire; and Dow asserts that Plaintiff's attorney did not reference a retaliation claim in the cover letter to the EEOC. (Doc. 23-5 at p. 3). Thus, according to Dow, an investigation into retaliation would not reasonably follow.

The Court finds that although Plaintiff's failure to satisfy a technicality by checking the "retaliation" box on the Charge does not warrant dismissal of the retaliation claim, the purpose of that rule, as noted, is to govern those who are unlettered and unschooled in the nuances of literary draftsmanship. Here, the record reflects that Plaintiff's Charge was not initiated *pro se.* (*Id.*). In fact, Plaintiff's attorney submitted a cover letter briefly describing the claims and completed the Intake Questionnaire in which the attorney's information was provided. (Doc. 23-5 at p. 3; Doc. 23-6 at p. 149). Therefore, because Plaintiff had retained counsel during the filing of the EEOC documents, the Court is not required to view the Charge in the "broadest reasonable sense." *See Williams v. Tarrant Cty. Coll. Dist.,* 2018 WL 480487, at *3 (5th Cir. Jan. 18, 2018) (unpublished) (per curiam) (citations omitted) (Because administrative charges are rarely drawn by an attorney, the only absolutely

essential element of a timely charge of discrimination is the allegation of fact contained therein; the Court must view administrative charges in the "broadest reasonable sense").

Here, Plaintiff makes reference to being "denied a reasonable accommodation which required a job transfer to another unit," but he does not provide that his termination was related to such denial, or that he was terminated after making a request for accommodation. (Doc. 23-6 at p. 148). Rather, Plaintiff provided that he "was discharged as an Operator earning $23.45 per year [sic].[11] According to the company, [he] was non-compliant in following the health services requirement." (*Id.*). Because Plaintiff has failed to describe the general nature of his retaliation claims, his Charge is insufficient to exhaust administrative remedies for his retaliation claims. *See e.g.*, *Williams*, 2018 WL 480487 at *3-4.

### B. Plaintiff's ADA Claims

In a discriminatory-termination action under the ADA, the employee may either present direct evidence that he was discriminated against because of his disability or alternatively proceed under the burden-shifting analysis first articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), a Title VII case. *E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014) (citing *Neely v. PSEG Tex., Ltd. P'ship*, 735 F.3d 242, 245 (5th Cir. 2013)). This analysis first requires Plaintiff to establish a prima facie case of discrimination. *Id.* If Plaintiff is successful, then Dow must articulate a legitimate, nondiscriminatory reason for terminating Plaintiff.

---

[11] The Court will assume that Plaintiff's intention was $23.45 per hour.

*LHC Grp., Inc.*, 773 F.3d at 694. Finally, the burden shifts back to Plaintiff to show that Dow's proffered reason is pretextual. *Id*. In the Rule 56 context, a prima facie case of discrimination plus a showing that the proffered reason is pretextual is typically enough to survive summary judgment. *Id*. Here, Plaintiff elected to establish his discriminatory-termination claim under the *McDonnell Douglas* burden-shifting framework. As noted, this framework requires Plaintiff to first establish a prima facie case of discrimination.

### 1. Disability

To establish a prima facie case of discrimination under the ADA, a plaintiff must demonstrate: (1) he has a disability; (2) he was qualified for the job; and (3) he was subject to an adverse employment action on account of his disability. *LHC Grp., Inc.*, 773 F.3d at 697. Dow moves for summary judgment on the sole basis that Plaintiff was not "disabled" within the meaning of the ADA. (Doc. 23-1 at p. 16). Dow argues that Plaintiff's Adjustment Disorder with anxiety and depression did not limit any major life activity because Plaintiff was capable of working in a different unit within Dow. (*Id*. at p. 17). Plaintiff argues that whether his symptoms could have been lessened by a transfer has no bearing on whether he was disabled. (Doc. 32 at p. 14).

An individual is disabled under the ADA if he demonstrates: (1) he has a physical or mental impairment that substantially limits one or more of his major life activities; (2) he has a record of such impairment; or (3) he is regarded as having such an impairment. *Aldrup v. Caldera*, 274 F.3d 282, 286 (5th Cir. 2001) (citing 42 U.S.C. § 12102(2)). Major life activities include caring for oneself, performing manual tasks,

walking, seeing, hearing, speaking, breathing, learning, and working. *Id*. (citing 29 C.F.R. § 1630.2(I)). An impairment is substantially limiting only if it "significantly restricts [the individual's] . . . ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities." *Id*. at 286–87 (citing 29 C.F.R. § 1630(j)(3)(I)).

Here, Plaintiff alleges that he suffers from the disability of Adjustment Disorder caused by "stress related events that [] occurred while interacting with others in his assigned unit at work." (Doc. 23-6 at p. 136). Additionally, Plaintiff was "diagnosed with adjustment disorder with depressed mood and anxiety due to job-related stress." (*Id*.). These claims demonstrate that Plaintiff was likely unable to perform any job in one specific unit, and is not evidence of his general inability to perform a broad class of jobs.

The central evidence offered by Plaintiff in support of his disability claim is a report from his social worker concluding that his symptoms included, *inter alia*, extreme anxiety, extreme fatigue, extreme tension, and extreme irritability and emotional distress. (*Id*.). Plaintiff further testified that he was "having problems breathing thinking about work" and that he was having trouble sleeping. (Doc. 32-6 at p. 61; Doc. 23 at p. 15). However, Plaintiff testified that each of his symptoms would have been alleviated if he would have been transferred to a "more healthy [sic] and better work environment." (Doc. 23-6 at p. 84).

As such, the Court finds that Plaintiff has failed to demonstrate that is he disabled within the meaning of the ADA. There has been no showing that Plaintiff's major life activities—working, sleeping, and breathing—were substantially limited

by his Adjustment Disorder, and his social worker's report does not indicate that he was substantially limited in any of the major life activities set out in the ADA. *See e.g., Aldrup*, 274 F.3d 282 (Employee's alleged depression, caused by the stress and anxiety of having to work with certain employees at a particular fire station, was not the type of disability protected by the ADA; the employee claimed an inability to perform any job at that particular location, not a general inability to perform a broad class of jobs). Therefore, absent a finding that Plaintiff is disabled within the meaning of the ADA, Plaintiff is unable to establish a prima facie case of disability discrimination; his ADA claims are dismissed.

### C. Dow's Legitimate Non-Discriminatory Reason for Terminating Plaintiff

Assuming, arguendo, that Plaintiff is able to establish a prima facie case of racial harassment/hostile work environment, disability discrimination, and retaliation, Dow is nonetheless entitled to summary judgment on each of these claims. As previously provided, Plaintiff must establish a prima facie case under each theory of law. If Plaintiff is successful, then Dow must articulate a legitimate, nondiscriminatory reason for terminating Plaintiff. Thereafter, Plaintiff must show that Dow's proffered reason is pretextual. Once a Title VII case reaches the pretext stage, the only question on summary judgment is whether there is a conflict in substantial evidence to create a question for the fact-finder. *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 404 (5th Cir. 1999) (citing *Rhodes v. Guiberson Oil Tools*, 75 F.3d 989, 993 (5th Cir. 1996) (noting that once a Title VII case reaches the pretext stage, the sufficiency of the evidence test is applied)). Throughout, the ultimate

burden of persuasion remains with the plaintiff. S*ee Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000). *See also Feist v. Louisiana, Dep't of Justice, Office of Att'y Gen.*, 730 F.3d 450, 454 (5th Cir. 2013) ("In order to avoid summary judgment [on a retaliation claim], the plaintiff must show 'a conflict in substantial evidence' on the question of whether the employer would not have taken the action "but for" the protected activity.").

Here, Dow has articulated a legitimate nondiscriminatory reason for terminating Plaintiff's employment. (Doc. 23-1 at pp. 10–12). Plaintiff's termination letter provided that he was being terminated because

> [he] had been non-compliant in following the requirements of Health Services, including failing to attend physician's appointments, provide sufficient documentation to validate [his] reason for being absent from work, and routine follow up with Health Services. Based on information provided from Health Services, [he was] scheduled to return to work on Tuesday, July 21, 2015, which [he] failed to do. As of that date, [his] absence [was] not covered under the Personal Illness or Paid Medical Leave policy, nor [was he] eligible for job protection under the Family Medical Leave Act (FMLA).

(Doc. 23-6 at p. 147). Although Plaintiff argues that he was not provided an exact return date either verbally or in writing, it is undisputed that all concerned parties characterized the leave time to be at least three weeks pending medical documentation and/or the results of an investigation into Plaintiff's discrimination allegations and possible transfer. (Doc. 32-6 at p. 35; Doc. 23-6 at pp. 40–42, 136; Doc. 23-8 at p. 4). At the end of the three week period, Dow did not possess the required medical documentation, Dow had evidence that Plaintiff did not follow the recommendations of his health care provider, and Plaintiff did not comply with Health Services' requirements by keeping Dow updated on his health status.

Nonetheless, Plaintiff has failed to show "a conflict in substantial evidence" on the question of whether Dow would not have terminated Plaintiff "but for" any protected activity, his race, or his disability. In fact, Plaintiff does not address pretext in his opposition at all. (Doc. 32). Rather, as provided *supra*, Plaintiff argues that "[Dow's] stonewalling [] has prevented [him] from seeking discovery of relevant and important evidence surrounding the substance of his termination meeting." (Doc. 32 at p. 20). The Fifth Circuit has held that speculation and an employee's personal belief are insufficient to create a fact issue as to pretext. *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) ("It is more than well-settled that an employee's subjective belief that he suffered an adverse employment action as a result of discrimination, without more, is not enough to survive a summary judgment motion, in the face of proof showing an adequate nondiscriminatory reason."). Thus, having failed to create a genuine issue of material fact as to whether Dow's proffered nondiscriminatory reason is merely pretextual or that his race was a motivating factor, Plaintiff cannot defeat Dow's motion for summary judgment.

### D. Plaintiff's State Law Claims

Lastly, Plaintiff has also failed to demonstrate that there is a genuine issue of material fact on his remaining state law claims under the LEDL and the Louisiana Environmental Whistleblower Statute, La. Rev. Stat. 30:2027 ("LEWA"). First, Title VII, the ADA, and the LEDL, provide similar rights and remedies; thus, both federal and state courts use the standards set forth under the ADA and Title VII to analyze LEDL claims. *Alderman v. Great Atl. & Pac. Tea Co.*, 332 F. Supp. 2d 932, 936 (E.D. La. 2004) (citing *La Day v. Catalyst Technology, Inc.*, 302 F.3d 474, 477 (5th Cir.2002);

*Spears v. Rountree Oldsmobile-Cadillac Co.*, 26,810 (La.App. 2 Cir. 4/5/95), 653 So.2d

182; *Plummer v. Marriott Corp.*, 94-2025 (La.App. 4 Cir. 4/26/95), 654 So.2d 843, *writ*

*denied*, 95-1321 (La. 9/15/95), 660 So.2d 460) ("Because of its doctrinal similarity to

Title VII, and the related social goals of both statutes, Louisiana courts routinely look

to Title VII to interpret the LEDL."). *See also Lindsey v. Foti*, 2011-0426 (La.App. 1

Cir. 11/9/11), 81 So.3d 41, 44, *writ denied*, 2012-0133 (La. 3/23/12), 85 So.3d 92 ("The

Louisiana statutes are similar to the [ADA]. Thus, in interpreting Louisiana's

employment discrimination laws, our courts have relied upon similar federal statutes

and the interpreting federal jurisprudence."). *Baker v. Fedex Ground Package Sys.*,

278 F. App'x. 322, 327 (5th Cir. 2008) ("We look to federal employment discrimination

jurisprudence when interpreting Louisiana's anti-discrimination laws."); *see also*

*King v. Phelps Dunbar, L.L.P.*, 743 So.2d 181, 187 (La.1999).

As Plaintiff offers only circumstantial evidence, the familiar *McDonnell*

*Douglas* burden shifting framework applies to both his retaliation claims under the

Louisiana Environmental Whistleblower Act[12] and his harassment and disability

claims under the LEDL. *Roberts v. Fla. Gas Transmission Co.*, 447 F. App'x 599, 601

(5th Cir. 2011) (citing *Gonzales v. J.E. Merit Constuctors, Inc.*, 263 F.3d 162 (5th Cir.

2001)) (applying *McDonnell Douglas* framework to LEWA retaliation claim).

---

[12] In order for a plaintiff to establish a prima facie case of retaliation under [LEWA], he must show:
(1) that he engaged in activity protected by the statute; (2) he suffered an adverse employment action;
and (3) a causal connection existed between the protected activity in which he engaged and the adverse
action. *Bain v. Georgia Gulf Corp.*, 462 F. App'x 431, 433 (5th Cir. 2012) (citing *Stone v. Entergy Servs.,*
*Inc.*, 2008-0651 (La.App. 4 Cir. 2/4/09), 9 So.3d 193, 198 *writ denied*, 2009-0511 (La. 4/17/09), 6 So.3d
797).

Accordingly, for the reasons provided *supra*, Plaintiff has failed to create a genuine issue of material fact as to whether Dow's proffered nondiscriminatory reason for terminating him is merely pretextual, that his race was a motivating factor under the LEDL, that he was disabled under the LEDL, or that Dow would not have terminated Plaintiff "but for" any protected activity.

## IV.   CONCLUSION

Accordingly,

**IT IS ORDERED** that Defendant's **Motion for Summary Judgment (Doc. 23)** is **GRANTED**.

**IT IS FURTHER ORDERED** that all claims brought by Plaintiff, Joshua Thibodeaux against Defendant, the Dow Chemical Company, are hereby **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that Plaintiff's **Motion for Continuance (Doc. 46)** is **DENIED AS MOOT**.

Baton Rouge, Louisiana, this 17th day of May, 2018.

**BRIAN A. JACKSON, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**